BABE and another, Appellants, vs. LAPPIN and another, Respondents.

*November 18—December 8, 1925.*

*Real-estate brokers: Construction of contract: Allowing broker reasonable time to close deal: Consideration: Broker interposing himself in transaction: Who entitled to commission: Evidence: Sufficiency.*

1. Real-estate agents who were authorized on Friday to negotiate a sale to a particular buyer who had already made an unacceptable offer (the agents having been given additional time in which to close the deal) have at least until the following Monday morning to conclude the negotiations, where there was a half holiday on Saturday.   p. 356.

2. A contract which authorized the real-estate agents to conclude the sale at a certain price, after the refusal of an offer made by the purchaser to the agents, was based on a valuable consideration, and the owner could not breach the contract within the time of performance without liability.   p. 357.

3. Plaintiff B., a real-estate broker, brought action for a commission on the sale of real estate, and the defendant owner deposited the commission in court, alleging that one G., also a broker, claimed the commission, whereupon B. then amended his complaint, joining a sub-agent with him as a party plaintiff.   G. was made a party, and the action proceeded as one in the nature of interpleader, the parties litigating their rights to the fund in court.   *Held,* that the evidence (set out in detail in the opinion) shows that the defendant G., who, on learning of the proposed sale, dishonestly interposed himself into the deal and did not render any service to the owner, but on the contrary sought to have the price reduced, is not entitled to the fund paid into court, but that the plaintiffs were the real procuring cause of the sale, which would have been closed by them except for the intervention of G.   p. 358.

APPEAL from a judgment of the circuit court for Milwaukee county: GUSTAVE G. GEHRZ, Circuit Judge.   *Reversed, with directions.*

An action was commenced for a commission on the sale of real estate by the plaintiff *Babe* against the owners of the real estate and their agent, Schneider.

Schneider made application to the court that he be permitted to pay the commission on the sale of the real estate into court, and that *Goodman,* who was claiming a commission, and *Lappin* be substituted as defendants. *Goodman* and *Lappin* had entered into an agreement with Schneider to save him harmless against any claim for commission by the plaintiff.

The complaint was then amended, joining *Barth* with *Babe* as plaintiffs, and substituting *Goodman* and *Lappin* as defendants in place of the original defendants, and the amended complaint further charged defendants with conspiracy to cheat and defraud.

The defendants *Goodman* and *Lappin* answered by way of denial and cross-complaint, in which cross-complaint *Goodman* demanded the money that had been paid into court. The cause proceeded to trial before the court without a jury, on the theory of both parties that they were entitled to the money *in custodia legis*.

For the appellants there was a brief by *Upham, Black, Russell & Richardson,* attorneys, and *Perry J. Stearns,* of counsel, all of Milwaukee, and oral argument by *Mr. Stearns*.

*Julius O. Roehl* of Milwaukee, for the respondents.

CROWNHART, J. It is important in this case to get a clear understanding of the evidence, and hence we set out the facts with some detail.

In May, 1923, the owners of the premises known as 376 Broadway, in Milwaukee, through their agent, Schneider, employed the appellant *Barth* to sell said property, and *Barth* in turn, having authority from Schneider so to do, employed the appellant *Babe* to assist him. The plaintiffs were real-estate brokers, and from May to October, 1923, *Babe* had been diligent in seeking prospective buyers. Early in October he had learned of *Lappin,* and from October 6th to October 22d *Babe* endeavored to sell the property to *Lappin*. He showed *Lappin* the building from top to bottom on October 10th. He got for *Lappin,* at his request, information from the building inspector's office with reference to the strength of the building to support another story, and on October 18th *Lappin* gave *Babe* a written offer of $40,000 for the premises and his check for $1,000 to apply on the purchase. Early in the afternoon of Friday, October 19th, Schneider, representing the owners, met in *Babe's* office with *Barth* and *Babe*. There *Lappin's* offer and check were submitted to Schneider. The offer was on the letterhead of the Lappin Electric Company, and the check was

signed "Lappin Electric Company, by *David C. Lappin,* President." Schneider saw both the offer and the check. He refused the offer of $40,000, but authorized *Babe* to sell to *Lappin* for $43,000, subject to the approval of one Lindsay, which approval he obtained about 5 o'clock of the same afternoon and conveyed the information to *Babe.* According to the testimony of *Barth, Lappin* was to have until Monday morning to say "Yes" or "No." *Babe* went to *Lappin* that same afternoon and returned *Lappin's* check and offer, and notified *Lappin* that the owners had refused the offer but that they would accept $43,000, and *Babe* urged *Lappin* to allow him to change the offer to $43,000 and keep the check. *Babe* testified that *Lappin* said:

"Don't hurry me so fast. That building is not going to get away. Don't hurry me. I would like to have a talk with the office help around here. Tomorrow is Saturday— only a half day. I think I will take it, but there is just Jew enough in me to see if I can't get it for forty-two thousand. Let me have a meeting with the boys tomorrow morning and come over here Monday morning at 9 o'clock and I think I will take it. Tomorrow is only half a day. It won't get away."

When *Babe* left *Lappin* it was understood that he was to meet *Lappin* again Monday morning. The testimony of *Babe* as to what took place between him and *Lappin* at this meeting is disputed by *Lappin.*

On this same Friday afternoon, October 19th, *Lappin* told his wife about the proposed purchase, and *Lappin's* wife conveyed the information to the wife of her nephew, the respondent *Goodman,* and she in turn conveyed the information to her husband. *Goodman* immediately got busy to worm himself into the deal as agent in the place of *Babe.* He went to the property and interviewed the tenant to find out the name of the owner, in which he was unsuccessful. He then went to *Lappin,* and *Lappin* disclosed that he had

made the check payable to one Schneider.  *Goodman* looked up the name of Schneider in the telephone directory and telephoned him, and then went out to see Schneider.  He did not disclose to Schneider that he was seeking to sell the property to *Lappin,* or his relation to *Lappin,* but he got an offer from Schneider to sell the premises at $45,000.  Later he claims he saw *Lappin* and again communicated with Schneider, seeking to have him reduce his price to $40,000. Schneider refused, and later *Goodman* made arrangements with Schneider to meet him on Sunday at Schneider's house. *Goodman* took *Lappin* with him, and there they negotiated the sale of the property to *Lappin* for $43,000.  As the deal was about to be closed, Schneider inquired if *Lappin* was the same party that *Babe* was negotiating with, to which *Lappin* replied that he was the same party but that he would now do business with *Goodman*.  On Monday morning *Goodman, Lappin,* and Schneider met in the office of Attorney James Quarles to make the necessary papers to close the deal, but Schneider demanded of *Lappin* and *Goodman* a guaranty against any liability against him for commission on the part of the plaintiff *Babe.*  This guaranty was made by *Goodman* and *Lappin.*

This statement of facts is not without contradiction by *Goodman* and *Lappin,* in so far as it relates to the actions of these two parties, but it is supported by the overwhelming weight of the credible evidence.  So far as the testimony of *Lappin* is concerned, it is very largely discredited by the discrepancies and contradictions between his testimony given under a sec. 4096 examination and the testimony on the trial.  His testimony is entitled to little weight except where it is corroborated by credible evidence.  The statement is not substantially disputed by the testimony of *Goodman* or Schneider.

From the statement of facts it will be seen that Schneider entered into a special contract with the plaintiffs on the 19th

of October, whereby plaintiffs were to attempt to negotiate a sale to *Lappin* at $43,000, and they were to have until Monday morning to close the deal, according to the testimony of *Barth,* and at least they were to have a reasonable time in which to close it under the testimony of Schneider. In view of the intervention of a half holiday on Saturday, and Sunday, we must say that the plaintiffs had at least until Monday morning to negotiate with *Lappin* to close the deal at $43,000. This agreement was based on sufficient consideration. Schneider wished to sell, and the plaintiffs had a live prospect. The property had been on the market for some time, and here was the opportunity to make a sale. *Babe* accepted Schneider's proposition, immediately made every effort to close the deal with *Lappin,* and had an appointment with *Lappin* for Monday morning with excellent prospects of making the sale. In the meantime *Goodman* and *Lappin* got their heads together to oust *Babe* from the transaction so as to save the commission to themselves. That is perfectly clear from the testimony. This was not disclosed to Schneider until the deal had been substantially closed on Sunday. Schneider then protected himself against what he believed to be probable liability to the plaintiffs, by requiring *Lappin* and *Goodman* to put up a guaranty to save him harmless from any claim by the plaintiffs. He further protected himself by withholding the commission until the commencement of this suit, when he paid the same into court. The rule laid down in 2 Mechem, Agency (2d ed.) § 2451, is:

"It is entirely competent for the parties to make a contract that the broker shall have a definite time; and, while the principal might, nevertheless, in such a case, revoke any authority he had given to the broker (not being coupled with an interest, etc.), he would be liable to the broker for the breach of the contract if he should terminate it before the expiration of the time fixed.

"It is, of course, possible for the parties in these cases to make an express and formal contract which would be free

from doubt; but, unfortunately, they rarely do, and the matter is left to be determined from more or less ambiguous materials. The great difficulty in the ordinary case is to determine whether there is any, and if so what, consideration for the principal's promise to grant a particular time."

And again at § 2435 Mechem says:

"It is not necessary that the broker who contends that he found the purchaser to whom the principal has sold should personally have conducted the negotiations between his principal and the purchaser which have resulted in the sale, or that he should have been present when the bargain was completed, or even, according to the weight of authority, that the principal should, at the time, have known that the purchaser was one found by the broker."

It must be noted in this case that this was a particular agency for a particular purpose. It was an agency to deal with *Lappin,* who was the plaintiffs' prospect, and the time which the plaintiffs were to have to negotiate the deal was specified, according to the testimony of *Barth,* and at least it involved but a short time, which would be entirely reasonable. We think the contract was based on a valuable consideration, and that Schneider could not breach the contract within the time of performance without liability.

On the other hand, *Goodman's* claim against this fund is based upon unethical and dishonest business practices. He interposed himself into the deal by suppression of the facts, in the first instance. He did not in fact render any service to Schneider or to the owners, but on the contrary, as he himself testified, he continually sought to get Schneider to reduce his price, knowing full well, as the testimony discloses without a doubt, that *Lappin* was anxious to obtain the property and would pay the price of $43,000 if he could not get it for less. *Goodman* is entitled to slight consideration.

This case is in the nature of an action of interpleader, and equitable principles should apply. 4 Pomeroy, Eq. Jur. (4th ed.) § 1320. We are to determine which of these

parties is equitably entitled to this fund, and we have no hesitation in saying that *Goodman* has no claim to it, either in law or in equity, and that on the contrary the plaintiffs were the real procuring cause of the sale to *Lappin,* and that but for the dishonest intervention of *Goodman* the sale would have been closed through the plaintiffs on Monday morning. There are no cases cited by the parties that are directly in point as to the facts in this case.

Sec. 2405*m*, Stats., provides:

"In any action or proceeding brought to the supreme court by appeal . . . if it shall appear to that court from the record : . . that it is probable that justice has for any reason miscarried, the supreme court may in its discretion reverse the judgment or order appealed from . . . and direct the entry of the proper judgment . . . as shall be deemed necessary to accomplish the ends of justice."

*By the Court.*—The judgment of the circuit court is reversed, with directions to enter judgment in favor of the plaintiffs.